IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARIA ISABEL GONZALEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-16-2378 |
| | § | |
| NANCY A. BERRYHILL,[1] | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION**

Pending before the court[2] is Defendant's Motion for Summary Judgment (Doc. 11). The court has considered the motion, the administrative record, and the applicable law. For the reasons set forth below, the court **GRANTS** Defendant's motion for summary judgment.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claims for disability insurance benefits under Title II and for supplemental

---

[1]    Carolyn W. Colvin was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position. Nancy A. Berryhill is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. See Fed. R. Civ. P. 25(d).

[2]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. See Doc. 10, Ord. Dated Feb. 14, 2017.

security income under Title XVI of the Social Security Act ("the Act").

## A.  Medical History

Plaintiff was born on June 20, 1961, and was fifty-one years old on the alleged disability onset date of July 20, 2012.[3] Plaintiff attained a general educational degree and worked as a senior data entry specialist at the University of Texas Health Science Center until she left that job in 2012.[4]

Plaintiff was injured in a car accident on November 22, 2011, and presented to the emergency room at Memorial Hermann where a variety of tests were conducted.[5]  The computerized tomography ("CT") scan of Plaintiff's brain was normal, and a CT scan of her chest did not reveal any abnormalities.[6]  Another CT scan of her abdomen showed a "minimal" collapse of her lungs, fatty infiltration in her liver, but no injury to the liver, spleen, gallbladder, pancreas, adrenals, kidneys, or bowel.[7]  A CT scan of her cervical spine showed "[n]o acute abnormalities," "[e]xtensive degenerative changes," and a "[s]mall indeterminate thyroid

---

[3]     See Tr. of the Admin. Proceedings ("Tr.") 54, 231.

[4]     See Tr. 52-54.

[5]     See Tr. 424-44.

[6]     See Tr. 506-08.

[7]     See Tr. 509.

hypodensity."[8]

Plaintiff saw Hina Pandya, M.D., ("Dr. Pandya"), on November 29, 2011, as a follow-up after the car accident, and complained of continuing headaches, nausea, vomiting, pain, and vision issues.[9] Plaintiff returned on December 9, 2011, complaining of increased chronic pain.[10] On December 14, 2011, Dr. Pandya recorded that Plaintiff had back pain, a fatty liver, a thyroid cyst, and chronic pain syndrome.[11] Plaintiff reported that she had improved since the car accident.[12] Plaintiff underwent an MRI of her thyroid on December 21, 2011, which showed that she had thyroid nodules, two right-sided and one left-sided, which were probably "complicated cysts."[13] In a follow-up examination on February 10, 2012, Dr. Pandya noted that Plaintiff's motor strength, gait, stance, and deep tendon reflexes were normal.[14] Plaintiff reported feelings of drowsiness, decreased appetite, and nausea, and that she was "[n]ot feeling better from [the] accident."[15] Plaintiff complained that she was also experiencing pain in her jaw, shoulder, back, and leg,

---

[8]    Tr. 511.

[9]    See Tr. 744.

[10]   See Tr. 742.

[11]   See Tr. 549.

[12]   See Tr. 548.

[13]   Tr. 530.

[14]   See Tr. 523.

[15]   Tr. 732.

3

but was going to physical therapy three times per week.[16]  On March 9, 2012, her motor strength, gait, and stance were normal.[17]

An MRI of Plaintiff's lumbar spine dated January 28, 2012, showed a posterior bulging disc at L5-S1 and hypertrophy (enlargement) of the facet joints.[18]

On February 1, 2012, Plaintiff presented to the Memorial Hermann liver clinic where it was reported by Jen-Jung Pan, M.D., ("Dr. Pan") that Plaintiff's liver disease had stabilized since 2009, and that she "did not have jaundice swelling, increased abdominal girth, vomiting blood, or confusion."[19]  Dr. Pan also noted that Plaintiff's fibromyalgia began after her car accident.[20]

On July 18, 2012, a liver ultrasound revealed a normal liver.[21] Plaintiff returned to the liver clinic on August 15, 2012, where it was noted that she had experienced hepatitis due to taking a fibromyalgia medication and had discontinued the medication.[22]

Plaintiff attended the Richmond Bone and Joint Clinic on May 8, 2012, where she was diagnosed with lumbar facet syndrome without

---

[16]     See id.

[17]     See Tr. 729.

[18]     See Tr. 513.

[19]     Tr. 653.

[20]     See id.

[21]     See Tr. 656-57.

[22]     See Tr. 658.

myelopathy.[23] It was also noted that she had fibromyalgia and degenerative disc disease.[24] Her reflexes were "intact and symmetrical" and her motor functions were normal.[25]

Plaintiff first saw Tareq AbouKhamis, M.D., ("Dr. AbouKhamis") for her fibromyalgia on February 27, 2012. Dr. AbouKhamis noted that Plaintiff had degenerative joint disease and commented that x-rays showed "early arthritic changes" in her hand joints, but no degenerative changes in her knee joints.[26] On March 12, 2012, Dr. AbouKhamis reported that there was "[n]o evidence of inflammatory arthritis" but that Plaintiff "likely has fibromyalgia," and that she was experiencing body aches, fatigue, and difficulty sleeping.[27]

On June 4, 2012, Plaintiff reported that she was feeling "more functional" but was depressed, had blurry vision, and was experiencing increased hair shedding.[28] Plaintiff's overall pain improved by June 27, 2012, but she still complained of some pain.[29] On August 1, 2012, Dr. AbouKhamis noted that Plaintiff's joint issues and tenderness had increased, and opined that it was

---

[23]    See Tr. 616-17.

[24]    See id.

[25]    Tr. 613.

[26]    See Tr. 695, 697.

[27]    Tr. 692-93.

[28]    Tr. 684-85.

[29]    See Tr. 680.

possible that she was "evolving into inflammatory arthritis."[30]  He noted also that Plaintiff suffered from fibromyalgia and depression.[31]  On July 25, 2012, Plaintiff reported that she was "experiencing increased widespread pain [and] fatigue."[32]  Plaintiff returned on August 1, 2012, where she complained of pain in her hand, shoulder, and lower back, and numbness in her right leg.[33]  On September 15, 2012, Plaintiff felt "a little better" because she was no longer working.[34]

Plaintiff experienced pain in her right foot on September 20, 2012; an x-ray revealed that she had a fracture with swelling in the tissue.[35]

On April 25, 2013, Plaintiff presented with swelling and a shooting pain from her groin to her heel, and complained also of neck and thumb pain.[36]  Plaintiff reported that she attended physical therapy for her back and shoulder three times a week and engaged in exercise through daily, two-mile walks and completing household chores.[37]  Plaintiff also reported worsening depression

---

[30]     See Tr. 673.

[31]     See Tr. 672-73.

[32]     Tr. 676.

[33]     See Tr. 672.

[34]     See Tr. 668.

[35]     See Tr. 698.

[36]     See Tr. 722.

[37]     See id.

and anxiety, and fibromyalgia flare-ups, which she stated were preventing her from returning to work.[38]

On May 21, 2013, Plaintiff underwent a consultative physical examination, conducted by Hanna J. Abu-Nassar, M.D. ("Dr. Abu-Nassar").[39] Dr. Abu-Nassar discussed Plaintiff's history of fibromyalgia, arthritis, back problems, depression, anxiety, carpal tunnel syndrome, degenerative joint disease, and hepatitis C.[40] Dr. Abu-Nassar reported that Plaintiff could: walk for five blocks, stand for one hour, sit for thirty minutes, lift two pounds with each hand overhead, bend, squat, and climb one flight of stairs.[41] Plaintiff's gait, straight leg raising test, and sensation to touch were normal.[42] Her deep tendon reflexes were one plus.[43] Plaintiff's thyroid was not enlarged, and she had "mild tenderness" in her back, neck, and buttocks.[44] The accompanying x-ray of her lumbar spine was "unremarkable."[45] Overall, Dr. Abu-Nassar concluded that Plaintiff had a "history of fibromyalgia [and] suspect[ed] degenerative arthritis of the hands," but it was

---

[38]    See Tr. 725.

[39]    See Tr. 749-53.

[40]    See Tr. 749-50.

[41]    See Tr. 750.

[42]    See Tr. 752.

[43]    See id.

[44]    Id.

[45]    Tr. 756.

doubtful that she had arthritis in her knees or neck.[46] Dr. Abu-Nassar also found that Plaintiff had cervicalgia and "possible spondyloarthrosis" in her lumbar spine, but no lumbar radiculopathy.[47]

Plaintiff visited Barbra Martinez, Psy.D. ("Dr. Martinez"), on May 23, 2013 for a consultative psychological examination.[48] Plaintiff explained her history of anxiety, stemming from when she was a child, and reported her symptoms, including "headaches, nausea and history of vomiting, shaking, excessive worrying, difficulty sustaining concentration and attention, difficulty being in crowds, increased heart palpitations, muscle tension, chest pains, difficulty breathing, and restlessness."[49] Plaintiff reported having difficulty completing tasks in a timely manner, lived with her aunt, managed her own finances, had social relationships, and took care of herself, including bathing, cooking, and cleaning.[50]

During the examination, Plaintiff was "very pleasant and cooperative," had "adequate hygiene and grooming," maintained eye contact, established a rapport, but was "easily tearful . . . and

---

[46]   Tr. 752.

[47]   Id.

[48]   See Tr. 762-66.

[49]   Tr. 763.

[50]   See Tr. 764.

could become mildly distracted."[51]    Dr. Martinez assessed Plaintiff's concentration and attention as "fair overall" and she had some memory issues, especially with her recent and working memory functions.[52]

Dr. Martinez assigned Plaintiff a Global Assessment of Functioning ("GAF") Score of 49, and diagnosed her with generalized anxiety disorder, major depressive disorder, and pain disorder.[53] Dr. Martinez noted that Plaintiff's condition could improve with proper medical treatment and therapy.[54]

On December 4, 2013, Robert Zicterman, D.C., ("Dr. Zicterman") filled out a physician's statement.[55] Dr. Zicterman indicated that Plaintiff could not sit, stand, walk, climb stairs or ladders, kneel or squat, bend or stoop, push or pull, type, or lift or carry for more than thirty minutes.[56] Dr. Zicterman also stated that Plaintiff was limited to lifting or carrying objects five pounds or less for six to eight hours per day at most.[57]

Plaintiff sought treatment from Ye B. Du, M.D., ("Dr. Du"), a psychiatrist, on October 10, 2014, and Dr. Du diagnosed Plaintiff

[51]    Id.

[52]    See Tr. 764-65.

[53]    See Tr. 765.

[54]    See Tr. 766.

[55]    See Tr. 767.

[56]    See id.

[57]    See id.

9

as suffering from posttraumatic stress disorder and major depressive disorder.[58] She noted that Plaintiff reported experiencing visual and auditory hallucinations, feelings of paranoia, panic attacks with related physical symptoms, and pain.[59]

## B. **Application to SSA**

Plaintiff applied for disability insurance benefits on October 1, 2012, and supplemental security income on October 1, 2012, claiming a disability onset date of July 20, 2012.[60] In a disability report dated March 26, 2013, Plaintiff claimed that fibromyalgia, multiple joint arthritis, diverticulitis, bulging disc injury, hepatitis C, and throat cyst limited her ability to work, and that she stopped working due to these conditions.[61] On September 3, 2013, Plaintiff reported that her daily activities included cooking, washing dishes, walking, driving, shopping, watching television, socializing with her aunt, and talking on the phone.[62] Plaintiff stated that she regularly went to the park for walks and to the grocery store.[63]

## C. **Hearing**

---

[58]    See Tr. 816.

[59]    See Tr. 814-16.

[60]    See Tr. 23, 231-34.

[61]    See Tr. 256-57.

[62]    See Tr. 298-300.

[63]    See Tr. 300.

At the hearing, Plaintiff and a vocational expert, Byron J. Pettingill ("VE" or "Pettingill"), testified.[64] Plaintiff was represented by an attorney.[65]

Plaintiff explained that she had been suffering with mental issues since she was a child, and that they became worse after her husband's assaultive behavior.[66] In terms of treatment for her mental health, Plaintiff testified that she attended monthly sessions with her psychiatrist and also saw a counselor.[67] Her depression resulted in the following symptoms: difficulty sleeping, low appetite, low energy, inability to focus, hallucinations and voices in her head, and low self-esteem.[68] Plaintiff's anxiety and PTSD stemmed from her relationship with her former husband, who assaulted Plaintiff, after which she shot him.[69] When Plaintiff's stress levels were high, it caused her to throw up, but she testified that she had not provided this information to her doctors as of the date of the hearing.[70]

Plaintiff testified that she was estranged from her three

---

[64]   See Tr. 39-70.

[65]   See Tr. 39.

[66]   See Tr. 46-47.

[67]   See Tr. 47.

[68]   See Tr. 47-48.

[69]   See Tr. 49.

[70]   See Tr. 49-50.

children.[71]  Because of her health conditions, Plaintiff no longer participated in her former hobbies of photography, spending time outside, camping, gardening, riding bikes, and going to the beach.[72] Plaintiff testified that she lived with her aunt and was not able to complete household chores regularly.[73]  Additionally, Plaintiff gave away her dog due to her inability to care for it.[74]  Plaintiff would lay down during the day and elevate her legs to relieve her pain.[75]  In terms of social and other activities outside the home, Plaintiff testified that she did not date, read books, vote, spend time with friends, attend church, or go to restaurants or movies.[76]

Plaintiff's last position was working as a senior support specialist for the University of Texas Health Science Center from 1999 to 2003, and again from 2008 to 2012.[77]  In the last six months of her position, she worked forty hours per week doing data entry.[78] After Plaintiff was in a car accident in November 2011, she had difficulty working and, as a result, she and her employer reached

---

[71]    See Tr. 49.

[72]    See id.

[73]    See Tr. 50.

[74]    See Tr. 52.

[75]    See Tr. 50-51.

[76]    See Tr. 51-52.

[77]    See Tr. 52-53, 61-63.

[78]    See Tr. 53.

a mutual decision that she would quit working.[79]  Plaintiff had

worked since she was eighteen years old.[80]

Plaintiff took several medications for depression and anxiety,

and utilized a transcutaneous electrical nerve stimulation ("TENS")

unit twice a week for pain.[81]  Additional treatment for pain

included steroid injections in her back.[82]  Plaintiff's pain

decreased her abilities to remember and concentrate.[83]  In terms of

physical activity, Plaintiff stated that she could lift less than

five pounds and could sit for twenty to twenty-five minutes before

she needed to move due to spasms in her back, neck, and shoulders.[84]

At the conclusion of Plaintiff's testimony, the VE discussed

Plaintiff's past work history and the capability of an individual

with Plaintiff's RFC to perform those or other jobs.[85]  Pettingill

stated that Plaintiff's past relevant work met the Dictionary of

Occupational Titles ("DOT") definition of a laboratory clerk, which

the VE considered a light position, and data entry clerk, which the

VE considered a sedentary position.[86]

---

[79]     See id.

[80]     See id.

[81]     See Tr. 54-55.

[82]     See Tr. 56-57.

[83]     See Tr. 55.

[84]     See Tr. 55-56.

[85]     See Tr. 60-69.

[86]     See Tr. 64-65.

The ALJ presented the following hypothetical individual:

Let us then, consider an individual of the same age, education, and work experience as the claimant. Said individual would be limited to light work. Further limited to only simple, routine, repetitive tasks; not performed at any fast-paced production environment; involving only simple work-related decisions; and then, generally relatively few work-place changes; further limit to only occasional interaction with supervisors, coworkers, and the general public.[87]

The VE testified that such an individual could not perform Plaintiff's past relevant work because her past work was semi-skilled and "would involve more than simple, routine, repetitive functions."[88] However, the VE found that Plaintiff could perform positions such as office helper, clothing sorter, and laundry folder.[89]

The ALJ then asked about what employers expect as normal attendance, to which the VE stated that

As far [sic] absences, your honor, most employers would consider a [sic] two or more absences from work per month on a consistent basis. They would consider that in excess of what their attendance policy would find acceptable. Routine rest periods, most employers will grant mid morning, and mid afternoon break of about fifteen minutes. And then, a lunch break, of thirty minutes to as much as an hour. And time on task, most employers expect their employees to be on task at least at a minimally satisfactorily performance level, eighty-five to ninety percent of the time.[90]

---

[87]    Tr. 65.

[88]    Id.

[89]    See Tr. 66.

[90]    Id.

14

The ALJ asked if an employee needed more absences than that, would that need take a person out of competitive employment; the VE answered affirmatively.[91]

Plaintiff's attorney presented several follow-up questions for the VE.[92] First, he asked if an individual could only lift and carry five pounds, would she be able to perform the identified positions, to which the VE answered no.[93] Additionally, the attorney asked if an individual had to lie down for an unscheduled hour during the work day, would that exceed the breaks discussed previously, and the VE responded affirmatively.[94]

**D. Commissioner's Decision**

On January 16, 2015, the ALJ issued a partially unfavorable decision.[95] The ALJ found that Plaintiff met the requirements of insured status through December 31, 2017, and that Plaintiff had not engaged in substantial gainful activity since July 20, 2012, the alleged onset date.[96] The ALJ recognized the following impairments as severe: "fibromyalgia, cervical degenerative joint disease, hepatitis C with liver cirrhosis, lumbar degenerative disc

---

[91] See id.

[92] See Tr. 68-69.

[93] See Tr. 68.

[94] See Tr. 68-69.

[95] See Tr. 23-33.

[96] See Tr. 25.

disease, arthritis, generalized anxiety disorder, and post-traumatic stress disorder" but noted that her carpal tunnel syndrome and chronic diverticulosis were not severe impairments.[97]

Plaintiff's severe impairments, individually or collectively, did not meet or medically equal disorders described in the listings of the regulations[98] (the "Listings"), according to the ALJ.[99] The ALJ found that Plaintiff had "the following degree of limitation in the broad areas of functioning set out in the [Listings for mental disorders] . . . mild restriction in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration."[100] In particular, the ALJ found that Plaintiff's mental impairments did not meet the criteria prescribed in paragraph "C."[101]

In determining Plaintiff's RFC to perform work-related activities, the ALJ discussed Plaintiff's alleged symptoms and her medical treatment and stated that he followed the regulatory requirements as to both.[102] When considering Plaintiff's symptoms,

---

[97]   Id.

[98]   20 C.F.R. Pt. 404, Subpt. P., App. 1.

[99]   See Tr. 26.

[100]   Id.

[101]   See id.

[102]   See Tr. 26-31.

16

the ALJ first evaluated whether a medically determinable impairment could reasonably be expected to produce the alleged symptoms.[103] Second, he evaluated the "intensity, persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit[ed] [Plaintiff's] ability to do basic work activities," making a credibility finding for those symptoms that were not substantiated by objective medical evidence.[104]

The ALJ discussed Plaintiff's medical treatment, including records from: an emergency room visit after her car accident on November 22, 2011, and related CT scans and x-rays; an x-ray of Plaintiff's thyroid on December 21, 2011; Dr. Pandya's examination on December 14, 2011; an MRI of Plaintiff's lumbar spine; medical records from the Richmond Bone and Joint Clinic; a visit to Dr. Pan on August 15, 2012; visits to the UT Physicians Clinic; x-rays of Plaintiff's hands and knees; x-rays of Plaintiff' foot; her consultative internal medicine examination; a consultative psychological examination; a visit to Dr. Du; and a physician statement from Dr. Zicterman.[105]

The ALJ explained that he accorded the opinion of Dr. Zicterman little weight because it was not supported by the medical

---

[103]    See Tr. 27.

[104]    Id.

[105]    See Tr. 28-30.

evidence and was not consistent with the overall record.[106] Specifically, the ALJ stated that Dr. Abu-Nassar's evaluation revealed that Plaintiff's limitations were not as extreme as Dr. Zicterman opined.[107] Additionally, Dr. Zicterman, as a chiropractor, was not considered an acceptable medical source under Social Security Ruling ("SSR") 06-03p.[108]

The ALJ engaged in a thorough account of Plaintiff's testimony regarding the symptoms that she experienced as a result of her impairments.[109] Specifically, the ALJ discussed the symptoms associated with Plaintiff's fibromyalgia, pain, depression, and anxiety.[110]

He concluded: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to October 14, 2014, for the reasons explained in this decision."[111]

---

[106]    See Tr. 30.

[107]    See Tr. 30-31.

[108]    See Tr. 30.

[109]    See Tr. 27.

[110]    See id.

[111]    Id.

The ALJ found Plaintiff capable of performing light work prior to October 14, 2014, because she could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for six hours in an eight-hour work day, and sit for a minimum of six hours in an eight-hour work day.[112] The ALJ included the following limitations in Plaintiff's RFC: (1) simple, routine, and repetitive tasks not performed in a fast-paced production environment involving only simple, work-related decisions; (2) relatively few workplace changes; and (3) occasional interaction with supervisors, coworkers, and the general public.[113] This RFC finding was decreased as of October 14, 2014, as the ALJ found that Plaintiff's allegations about her symptoms beginning on that date were credible.[114] The ALJ considered the examination conducted by Dr. Du on October 10, 2014, which diagnosed Plaintiff with post traumatic stress disorder and major depressive disorder coupled with psychotic tendencies.[115]

The ALJ found that Plaintiff was not able to perform any of her past relevant work as a laboratory clerk or data entry clerk, as the requirements of these positions were greater than her RFC.[116]

---

[112]    See Tr. 26.

[113]    See id.

[114]    See Tr. 31.

[115]    See id.

[116]    See id.

The ALJ stated that Plaintiff was approaching advanced age with a high school education and the ability to communicate in English.[117] Considering Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff could perform other jobs in the national economy, including positions such as office helper, clothing sorter, and laundry folder.[118]  The ALJ concluded that Plaintiff was not disabled until October 14, 2014, but became disabled on that date and continued to be disabled through the date of the decision.[119]

Plaintiff appealed the ALJ's decision, and, on June 24, 2016, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[120]  After receiving the Appeal's Council's denial, Plaintiff, proceeding pro se, sought judicial review of the decision by the court.[121]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: (1) the ALJ applied proper legal standards in evaluating

---

[117]     See id.

[118]     See Tr. 32.

[119]     See Tr. 33.

[120]     See Tr. 1-7.

[121]     See Doc. 1, Pl.'s Compl.

the record; and (2) substantial evidence in the record supports the decision.  <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  <u>Legal Standard</u>

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); <u>see also</u> <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has

> done in the past must be found "not disabled;" and (5) if
> the claimant is unable to perform his previous work as a
> result of [her] impairment, then factors such as [her]
> age, education, past work experience, and [RFC] must be
> considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20

C.F.R. § 416.920.  The analysis stops at any point in the process

upon a finding that the claimant is disabled or not disabled.

Greenspan, 38 F.3d at 236.

## B.  **Substantial Evidence**

The widely accepted definition of "substantial evidence" is

"that quantum of relevant evidence that a reasonable mind might

accept as adequate to support a conclusion." Carey v. Apfel, 230

F.3d 131, 135 (5th Cir. 2000).  It is "something more than a

scintilla but less than a preponderance." Id.  The Commissioner

has the responsibility of deciding any conflict in the evidence.

Id.  If the findings of fact contained in the Commissioner's

decision are supported by substantial record evidence, they are

conclusive, and this court must affirm.  42 U.S.C. § 405(g);

Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings

exist to support the Commissioner's decision should the court

overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir.

1988).  In applying this standard, the court is to review the

entire record, but the court may not reweigh the evidence, decide

the issues de novo, or substitute the court's judgment for the

22

Commissioner's judgment.  <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

### III. Analysis

Defendant moved for summary judgment, arguing that the Commissioner's decision was legally sound and supported by substantial evidence.  Plaintiff did not file a response to this motion or a motion for summary judgment.  The court has reviewed the ALJ's decision and agrees that it was supported by substantial evidence and did not contain legal error.

Although Plaintiff did not file a motion for summary judgment, she attached to her complaint medical records that she asserted were not considered by the ALJ.  Plaintiff argued in her complaint that these records demonstrated that she was disabled before October 14, 2014.

The court may remand a case to the Commissioner for further action if there is a showing that new evidence not in the record "is material and that there is good cause for the failure to incorporate such evidence in the record in a prior proceeding."  42 U.S.C. § 405(g).  "For new evidence to be material, there must exist the 'reasonable possibility that it would have changed the outcome of the [Commissioner's] determination'" had the evidence been presented.  <u>Latham v. Shalala</u>, 36 F.3d 482, 483 (5th Cir.

1994)(quoting <u>Chaney v. Schweiker</u>, 659 F.2d 676, 679 (5th Cir. 1981)). Material evidence relates to the period for which benefits were denied, not to later-acquired disabilities or to a post-hearing deterioration of Plaintiff's condition. <u>Johnson v. Heckler</u>, 767 F.2d 180, 183 (5th Cir. 1985).

Here, Plaintiff alleged in her complaint that Defendant had "[n]ot received supporting evidence from [her] lawyer."[122] Specifically, she points to medical records from: June 4, 2012, supporting the diagnosis of fibromyalgia; July 9, 2012, showing a bulging disc at L5-S1; an MRI taken on January 28, 2012; and July 24, 2003, reflecting her colectomy with colostomy. However, the medical records from June 4, 2012, and the January 28, 2012 MRI were both included in the original administrative record, and therefore they are not new records. The records from the 2003 colectomy were not included but, as they were from 2003, they are not material to the pertinent time period in this case, and the colectomy was mentioned in some of her other records included in the administrative record.

As to the medical records from July 9, 2012, these were not included in the administrative transcript in this case. Plaintiff claims that they show that she had a "L5-S1 posterior bulging disc with hypertrophic changes in facet joints."[123] However, this

---

[122]    Doc. 1, Pl.'s Compl. p. 3.

[123]    Doc. 1, Pl.'s Compl. p. 6.

finding would not change the outcome in this case, as the MRI from January 28, 2012, which was included in the administrative record, already provided this information to the Commissioner. Looking over the July 9, 2012 record, it discusses Plaintiff's pain, which Javier Canon, M.D., ("Dr. Canon") says "improved by 95%" after she received an injection.[124]  Additionally, her motor function and sensation to touch were normal, and her reflexes were "intact and symmetrical."[125]  Therefore, while this evidence was new, it is not material to the case because it does not provide any medical evidence that would have changed the outcome.

## IV.  Conclusion

Based on the foregoing, the court **GRANTS** Defendant's motion for summary judgment.

**SIGNED** in Houston, Texas, this 13th day of December, 2017.

_____

U.S. MAGISTRATE JUDGE

---

[124]    Id. p. 16.

[125]    Id. p. 18.